In re GASLIGHT CLUB, INC., New York Gaslight Club, Inc., Washington Gaslight Club, Inc., Florida Gaslight Club, Inc., O'Hare International Gaslight Club, Inc., Chicago Gaslight Club, Inc., Clubmen, Inc. and The Ten Twenty Corporation, Debtors.

CREDITORS' COMMITTEE OF GASLIGHT CLUB, INC., for the Use and Benefit of GASLIGHT CLUB, INC., et al., as Debtors in Possession, Plaintiff,

v.

Robert M. FREDRICKS, Defendant.

Bankruptcy Nos. 83 B 603, 83 B 604, 83 B 605, 83 B 606, 83 B 607, 83 B 608, 83 B 609 and 83 B 610.
Adv. No. 84 A 862.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 4, 1994.

**510**

Daniel Zazove, Siegan, Barbakoff, Gomberg & Kane, Michael Dockterman, Wildman, Harrold, Allen & Dixon, Chicago, IL, at Trial, for Creditors' Committee, plaintiff.

David Missner, Rudnick & Wolfe, Chicago, IL, for debtors.

Lawrence Fisher, Timothy Casey, Gardner, Carton & Douglas, Chicago, IL, for Robert M. Fredricks, defendant.

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

■ This matter comes before the Court on Plaintiff's Amended Complaint alleging breach of fiduciary duty, actual and constructive fraud, tortious interference with valid business relations and waste of corporate assets, and Defendant's counterclaim for the recovery of wages and personal property. The Court has core jurisdiction over the Amended Complaint and non-core jurisdiction over the counterclaim.[1] On the eve of trial, Defendant moved to dismiss the Amended Complaint. That motion was taken under advisement and trial of the issues raised in the Amended Complaint was held and concluded. The Court now enters Find-

---

1. The parties did not specify whether this proceeding is core or non-core as required by Bankruptcy Rules 7008(a) and 7012(b). The Court must therefore make this determination. 28 U.S.C. § 157(b)(3). In the Seventh Circuit, a proceeding is core under 28 U.S.C. § 157 "if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Diamond Mortgage Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir.1990), *cert. denied*, 498 U.S. 1089, 111 S.Ct. 968, 112 L.Ed.2d 1054 (1991) (citations omitted). Count VI of the Amended Complaint (actual fraud) is premised upon Fredricks' duty to file financial reports with the Court arising out of his capacity as debtor-in-possession. Absent the bankruptcy proceeding, there would be no filing requirements so the claim would not arise. Thus the claim for actual fraud is a core proceeding. The issues presented

in the remaining counts of the Amended Complaint involve substantive rights and obligations that flow directly from the provisions of Title 11. The complaint seeks redress from Fredricks for his conduct as director, controlling shareholder, president and responsible party of the Debtor corporation. The Plaintiff's legal theory is that Fredricks breached the fiduciary and statutory duties he owed in some or all of these capacities under the Bankruptcy Code. The fact that some of those duties may overlap with duties owed by officers and controlling shareholders of insolvent corporations under state law does not change the essential bankruptcy character of these transactions. The counterclaim is non-core, but its resolution may have a direct and substantial impact on the asset pool available for distribution to the estate. Accordingly, Fredricks' counterclaim is a "related to" proceeding. The remaining counts are core.

ings of Fact and Conclusions of Law after review of the pleadings, memoranda and evidence presented.

### FINDINGS OF FACT

1. Gaslight Club, Inc., a Delaware corporation, owned a series of dining and entertainment clubs including: the New York Gaslight Club, Inc. in New York, NY; the Washington Gaslight Club, Inc. in Washington, D.C.; the Florida Gaslight Club, Inc. at the Fontainebleau Hilton in Miami Beach, FL; Clubmen, Inc. at the Palmer House Hotel in Chicago, IL; O'Hare International Gaslight Club, Inc. near O'Hare Airport in Chicago, IL; the Chicago Gaslight Club, Inc. on Huron Street in Chicago, IL; and the Chateau Louise Hotel in West Dundee, IL. Each club except the Washington club was a separate corporate entity and wholly owned subsidiary of Gaslight Club, Inc. The Washington club itself was owned by its members while the real estate was owned by the Ten Twenty Corporation, which is also a subsidiary of the Gaslight Club, Inc.[2]

2. Gaslight filed a voluntary petition under chapter 11 of the Bankruptcy Code on January 17, 1983. The cases were jointly consolidated and jointly administered for procedural purposes.

3. Gaslight's assets included property at 24 West Erie Street in Chicago, which the parent corporation owned in partnership with Martin Schaffer and Anthony Bonavolonta. The Erie property was used by Gaslight Club, Inc. for storage and office space.

4. At the time the chapter 11 petition was filed, the Defendant, Robert Fredricks ("Fredricks"), was president and chief executive officer of Gaslight Club, Inc., chairman of Gaslight Club, Inc.'s board of directors, and the majority (approximately 54%) shareholder of Gaslight Club, Inc. The bankruptcy court designated Fredricks as the party responsible for Gaslight's business operations. His duties included preparing and filing court reports and schedules, ensuring that taxes were timely paid, and acting as a liaison to the board of directors, providing information about whether or not a deal should be pursued and when and if a plan should be filed or supported.

5. Among Gaslight Club's other directors were Harold Fein ("Fein"), secretary, and James Devore ("Devore"), treasurer. Gaslight Club, Inc. had about 430 shareholders. Gaslight Club, Inc.'s original attorneys of record were Norman Hanfling ("Hanfling") and David Missner ("Missner"). Hanfling also served as assistant secretary of Gaslight Club, Inc. Daniel Zazove ("Zazove") was employed as counsel for the Creditors' Committee (the "Committee"). At various times, Fredricks was represented personally and in his capacity as officer, director and majority shareholder by John McCarthy, Fein, and Louis Levit ("Levit") and Richard Mason ("Mason") of the firm Levit & Mason.

6. In early February, 1983, Michael Zavis ("Zavis") contacted Hanfling and Zazove on behalf of a group of clients expressing an interest in purchasing the clubs for about $1.8 million. Under Zavis' proposal, unsecured creditors would be paid in full over a period of time. Zavis's clients would acquire at least 80% of Gaslight's stock and Fredricks would retain 10% ownership interest.

7. Zavis attempted to arrange a meeting with Fredricks to discuss the details of his proposal and to determine what steps he must take for the purchase of the clubs as a going concern. Hanfling and Missner urged Fredricks to meet with Zavis personally, stressing that Gaslight had an immediate problem of a continuing negative cash flow which was rapidly dissipating the equity in the business. In spite of his knowledge that time was of the essence and a speedy resolution was critical, Fredricks did not like being relegated to a minor role after the acquisition and resisted meeting with Zavis. Zavis communicated his inability to negotiate with Fredricks to Zazove in the hopes that the Committee would be able to apply pressure on Fredricks to talk.

8. Zavis' interest in Gaslight continued through June of 1983. However, frustrated

---

2. For convenience, the parent and all subsidiary corporations will be collectively referred to as "Gaslight."

by Fredricks' stonewalling, Zavis and his clients eventually withdrew.

9. Fredricks was primarily interested in obtaining financing to continue the clubs as a going concern rather than selling the company because he wanted to retain control. Fredricks brought in Wallace Johnson to help develop an economic plan. Despite the fact that Johnson was experienced in corporate workouts and that Fredricks solicited his input, Johnson's recommendations were neither followed nor seriously considered so he ceased advising Fredricks regarding Gaslight.

10. In late March, 1983, George Foundos ("Foundos") expressed an interest in purchasing Gaslight as a going concern on behalf of Tramps, Inc. Foundos indicated that he was willing to assume up to $1.8 million of Gaslight's unsecured obligations and that he could obtain financing through Beverly Bank. Foundos presented his proposal at a meeting with Fredricks at Gaslight on or around March 29, 1983. Fredricks wanted more for himself personally than Foundos was willing to offer. Therefore, Fredricks did not pursue the Foundos proposal—he did not respond to the proposal, give any input, or present an alternative offer.

11. Under Foundos' proposed plan, chapter 11 administrative expenses would be paid in full upon confirmation and taxes would be paid in full in installments. Mortgages on Gaslight's real estate would either be paid in full upon confirmation or assumed and negotiated with the mortgagors. Other obligations would be paid in the ordinary course of business. Unsecured creditors with claims under $200.00 would be paid in full at confirmation. Unsecured creditors with larger claims could either receive a lump payment of 50% their claims at confirmation or they could elect to receive a small payment at confirmation with the balance paid over time without interest. Fredricks would have to resign or be replaced as the responsible person.

12. The Committee indicated that it would support Foundos' plan if 1) it received assurance of Tramps' financial ability to make the payments called for in the proposal; 2) Tramps obtained either loan commitments or letters of credit; and 3) the plan provided for a contingency in the event that unsecured claims exceeded $1.8 million. Foundos was willing and able to meet these conditions.

13. On June 15, 1983, Fredricks wrote a letter to the bankruptcy judge to whom the case was assigned (Judge Edward Toles) suggesting the closing of unprofitable clubs and the sale of the remaining clubs as a going concern. Fredricks volunteered to undertake inquiries into obtaining additional financing for the clubs. However, Fredricks failed to present a reorganization plan during the 120 day exclusive period set forth in 11 U.S.C. § 1121(b).

14. On or around July 13, 1983, the Committee moved for the entry of an agreed order authorizing and directing the closing of the New York club, the sale of Gaslight's excess real and personal property and the submission of a reorganization plan by the Debtor within 30 days. Judge Toles entered the order on July 15, 1983. Fredricks took no action to comply with this order.

15. To gain admission to the Gaslight clubs, patrons were required to purchase membership "keys" annually. Gaslight's primary source of revenues was the sale and renewal of these annual memberships and the sale of food and beverages. At some time during Fredricks' tenure, Gaslight began to accept major credit cards for payment instead of requiring members to charge services to their Gaslight key accounts. This practice sped up the receivables collection process and alleviated problems with bad debts, but it led many customers to conclude that renewal of their membership cards was unnecessary. As a result, the number of renewals and new memberships declined.

16. Under Fredricks' stewardship, Gaslight incurred pre-tax operating losses of $1.6 million from January through August, 1983. Additionally, revenues derived from annual membership fees steadily declined. Fredricks adopted no substantial measures to trim the budget or to reduce employee salaries and benefits, food and beverage costs, the number of employees, accrued revenues

or advertising costs after the bankruptcy petition was filed.

17. On or around August 30, 1983, the Court entered an order designating William A. Brandt, Jr. ("Brandt") (a management consultant) as "responsible person" to operate the debtors' businesses and to manage their property. Specifically, the order required Brandt to "perform the duties imposed upon the debtors by the applicable provisions of the Bankruptcy Code," and gave him "full and exclusive power ... to employ [and] discharge ... all managers, officers, directors, agents, employees and servants of the debtors, as he may deem necessary and advisable ..." The order cited Gaslight's increasing losses, the erosion of equity in the debtors' assets and Fredricks' failure to restructure the business to generate profits or, alternatively, to produce a buyer for the clubs as grounds for the substitution of management. Fredricks acquiesced in the entry of this order.

18. At the time he was designated as Gaslight's responsible party (and pursuant to an agreement with Fredricks), Brandt retained Fredricks as an employee to perform public relations functions. Fredricks was not to play a role in Gaslight's management. Brandt lowered Fredricks' salary from $150,000 to $100,000 and gave Fredricks no assurances of continued employment with Gaslight. Fredricks consented to this arrangement. The relationship between the two became strained and Fredricks refused to recognize Brandt's authority. Within a matter of weeks, Fredricks began to threaten and attempt to control Gaslight employees, prompting numerous complaints. Brandt then terminated Fredricks' employment.

19. Gaslight was required to file both monthly and semi-monthly financial reports with the Court. During Fredricks' tenure, the reports were prepared by Devore, reviewed in a cursory fashion by Missner and signed by Fredricks. These reports were not timely filed, and some financial statements were never submitted. The reports also failed to include interest accrual on secured debt (most notably, real estate taxes) and unpaid lease obligations. Further, Gaslight operated "on the float" for current obligations so that debts were being paid before incoming funds had cleared.[3] The magnitude of the float ranged from $400,000 to $600,000. This float practice was similarly not reflected in the financial reports filed with the Court.[4]

20. On or around September 22, 1983, another group of investors expressed an interest in acquiring the Gaslight Clubs (excluding the Chateau Louise) as a going concern. This group consisted of Zev Karkomi ("Karkomi"), Joseph Rosin, Devore and Hanfling. The group's proposal offered payment in full of all secured, priority and administrative claims, payment in full of all unsecured claims of $200 or less at confirmation and payment in full of all unsecured claims in excess of $200 over a period of years without interest. Stockholders would receive debentures for $0.25 for each share of old stock. The debentures would begin to accrue interest at 9% once all creditors were paid in full. Fredricks would have a consulting position with the reorganized company. The investors' designee would have the right of approval of all daily operations and any substantive changes. In support of its plan, the Karkomi group procured letters of credit from Main Bank of Chicago and Ben Franklin Bank.

21. Because he feared a potential conflict of interest arising out of his participation in the investor group, Hanfling sought to for-

---

**3.** A business operating "on the float" predicts what its cash receipts are going to be, writes checks on the expectation of receiving the cash, and assumes that the checks will take a few days to clear the bank. Put differently, a checking float occurs when someone writes a check with insufficient funds and then covers the check before it is presented to the bank for payment. *In re Clemente,* 15 B.R. 937, 941 (Bankr.N.D.Ohio 1981). If the cash is actually received when expected, the checks will be honored; otherwise, they will bounce due to insufficient funds.

**4.** Local Rule XI–3.03(C) in place at that time required the reporting of the amount of accounts receivable on hand, created and paid at the beginning and end of each month. These reports were prepared on a cash basis. However, had the reports been prepared on an accrual basis, the float practice would have been more easily detectible.

mally withdraw as counsel for Gaslight. The Court entered an order allowing Hanfling to withdraw his appearance nunc pro tunc as of September 22, 1983.

22. The Committee formulated a reorganization plan based on the Karkomi group's proposal. Reluctantly, Fredricks agreed to support the Karkomi proposal. Shortly afterward, however, Fredricks withdrew his support, accused Hanfling of backstabbing and threatened to prevent Hanfling and Karkomi from acquiring the clubs.

23. In October, 1983, Fredricks and the Gaslight board sought court approval to hire the firm of Levit & Mason to replace Missner as counsel for Gaslight. The Committee filed an objection to the substitution. The Karkomi group was also opposed to any change in debtors' counsel because it would inevitably result in additional delays and complications.

24. On or around October 27, 1983, Fredricks filed a motion for the appointment of a chapter 11 trustee, or, alternatively, to reinstate himself, maintaining that Brandt's designation as the person responsible for the management of Gaslight was improper. The Committee and the United States Trustee opposed the motion.

25. On April 4, 1984, Judge Toles denied the motions to substitute counsel and for the appointment of a trustee/reinstatement of Fredricks. Fredricks appealed the order to the District Court. Judge Aspen affirmed the bankruptcy court's ruling. Fredricks then appealed to the Seventh Circuit, which affirmed Judge Aspen and Judge Toles. *See Matter of Gaslight Club, Inc.,* 782 F.2d 767 (7th Cir.1986).

26. The Karkomi group's financing was contingent upon confirmation of a reorganization plan. As a result of Fredricks' objections, the investors were forced to request numerous extensions on their loan commitments.

27. In late October, 1983, Brandt barred Fredricks from the Gaslight premises and discharged him from his position as president of Gaslight. Fredricks then adopted a hostile posture toward Brandt, the Committee and supporters of any plan of reorganization that would not restore him to substantial

control over Gaslight's management and operations. However, in spite of his status as a persona non grata at the Gaslight Clubs and his divestment of authority, Fredricks was not physically barred from the clubs at all times. Fredricks retained a key to the closet in his Chateau Louise apartment. At no time did Fredricks attempt to recover (or have someone else recover for him) any property he may have locked in the apartment closet.

28. On or around November 16, 1983, the Committee filed a disclosure statement and proposed plan of reorganization. The plan provided for a sale of all of Gaslight's assets in exchange for cash and periodic payments to Gaslight's creditors and shareholders. Fredricks objected to the plan and disclosure statement on numerous grounds. The initial disclosure statement was subsequently approved by the Court on January 6, 1984 and disseminated to all parties in interest.

29. On or around December 22, 1983, the Committee filed an Amended Plan of Reorganization and Disclosure Statement. The amendments were intended to satisfy Fredricks' objections to the original plan. Fredricks nevertheless objected to the Amended Plan and Disclosure Statement as well. Judge Toles subsequently approved the Committee's Amended Disclosure Statement and Plan.

30. In January, 1984, Fredricks subpoenaed all of the proponents of the Amended Plan for depositions, including the financial backers (Karkomi and Rosin), institutional lenders (Thomas Vivaldelli of Ben Franklin Savings and Darrell Clay of Main Bank of Chicago), Hanfling and Devore. The Committee's view was that these depositions were an abuse of process designed to harass and ultimately drive off the Karkomi group.

31. On January 23, 1984, Fredricks filed a competing plan of reorganization. At that time, the Committee's plan had not yet been confirmed. Fredricks' plan provided for long term payments of tax claims and payment of mortgages and related real estate claims from proceeds of the sales of real property. Secured claimants would receive minimal payments over the first year followed by a

balloon payment of the balance. Fredricks was to retain control over Gaslight's operations receiving a $150,000 annual salary, and the Levit & Mason firm was to be retroactively substituted as counsel for Gaslight. Under Fredricks' plan, it was unlikely that secured or unsecured claims would be paid in full.

32. On or around January 27, 1984, Karkomi wrote a letter to the interested parties withdrawing his participation in the Committee's plan of reorganization. Karkomi cited Fredricks' "ever-constant objections" and "the indeterminable delays and unbridled issuance of subpoenas to the supporting lending institutions" as reasons for the withdrawal of his support. Hanfling and Devore dispatched a letter evincing their withdrawal for identical reasons on February 9, 1984. As a result, the Committee's Amended Plan was never approved.

33. Shortly thereafter, Brandt closed the Washington, Huron Street and Florida clubs and solicited offers to sell the Washington real estate. Chateau Louise was closed and the estate's interest therein abandoned pursuant to a February 24, 1984 order. The Florida property was eventually abandoned along with over $1 million of equipment in exchange for cancellation and termination of the lease. The Committee concluded that these clubs were not viable due to lack of long term management and corporate planning, uncertainty regarding Gaslight's ability to retain and expand its membership base, cash flow problems which hindered the company's ability to implement corrective measures, and the pall cast by the possibility of Fredricks regaining control.

34. On or around March 1, 1984, Mason informed Zazove that Fredricks would continue to resist any reorganization plans or sales of Gaslight property that would not allow Fredricks to play a substantial role in management of the company and adequately compensate shareholders. Mason further implied that the Committee's failure to concede on this issue would result in "a flurry of litigation."

35. On March 2, 1984, Missner received an offer from Sanford Takiff on behalf of Ron of Japan to purchase Gaslight's assets (excepting the Washington D.C. and Erie Street real estate) for $2 million cash. The offer was subsequently reduced to $1.4 million in April.

36. In March, 1984, the Committee and Brandt filed a motion with this Court to sell the Washington club. Judge Toles entered an order on March 15 authorizing the sale of the Washington property over objections by Fredricks and his counsel. Fredricks appealed the order to the District Court where the ruling was affirmed. The Washington real estate was ultimately sold for $522,-044.61. The personal property at the Washington club was sold for a total of $54,901.22.[5]

37. On March 22, 1984, Fredricks filed a medical insurance claim seeking disability payments. Fredricks represented on the application that he had an upper respiratory infection that rendered him "totally disabled" as of September 1, 1993.

38. On or around June 15, 1984, Missner received an "expression of interest" in purchasing the remaining clubs and assets from Glenn Sergiyama. The proposal involved payments of $400,000 in taxes and a cash infusion of $100,000 as working capital. No dividends would be paid to shareholders.

39. At about the same time, Missner received an "expression of interest" from James Roberts ("Roberts") who wished to purchase Gaslight's Palmer House and O'Hare clubs for $450,000. The purchase price was subsequently raised to $500,000. In July, Roberts and Paul Ziegler ("Ziegler") increased the offer to $1 million with a $600,-000 cash down payment. The Northern Trust Bank of Woodfield, IL agreed to provide financing for this transaction.

40. Brandt received an offer from Norman Patinkin and William Wheeler to buy the Palmer House and O'Hare clubs for $820,000 on around July 9, 1984. He also received an "expression of interest" and re-

---

**5.** Fredricks purchased $11,200 of personalty and the balance was sold at auction to an independent buyer.

quest for further information regarding the clubs from Plato Foufas on or around July 11, 1984.

41. On or around July 16, 1984, the Committee filed another plan. By this time, Gaslight's membership had declined from a high point of about 40,000 members to only about 11,000 members. Zazove sent a letter to Levit & Mason inviting them to address the Committee regarding the liquidating plan. No such meeting was ever sought by Fredricks' attorneys.

42. On July 17, 1984, the Committee filed a motion to sell Gaslight's property at the Palmer House and O'Hare to Roberts and Ziegler for $1 million. The Court scheduled a hearing to consider the offer, objections and competing bids. Separate objections to the sale were filed on August 13 by Fredricks and Harvey Herman, a potential bidder. Fredricks reiterated that he would not support a sale to a buyer who was unwilling to offer him employment with Gaslight.

43. One week later, the Committee filed a three count complaint against Fredricks. Count I sought recovery of Gaslight's antiques and collectibles in Fredricks' possession (collectively valued at $30,250). Count II sought turnover of a car belonging to Gaslight. Count III sought recovery of $13,333.36 plus interest for postpetition interest that Fredricks paid to himself on a prepetition loan.

44. On August 2, 1984, Judge McCormick (in Judge Toles' absence) entered an agreed order resolving Counts I and II of the complaint. Fredricks agreed to pay the estate $7,500 in satisfaction of Count I and $3,800 in satisfaction of Count II. In return, Fredricks was given possession of the property at issue.

45. A group headed by Anthony Tortoriello submitted a written proposal to Brandt to purchase the Palmer House and O'Hare properties for up to $1.1 million on August 10, 1984. Both Roberts and Ziegler and Tortoriello subsequently increased their bids. Fredricks objected to both proposed sales but failed to present any viable alternative chapter 11 plan. Judge Hertz (in Judge Toles' absence) approved a sale of assets to Roberts and Ziegler for $1.2 million on August 20, 1984. Fredricks promptly appealed this order to the District Court. Judge Aspen dismissed the appeal as moot in January, 1985 because the sale had already closed.

46. Fredricks answered the remaining count of the complaint on September 4, 1984 admitting that he received $13,333.36 from Gaslight. The answer included a counterclaim against the estate for the recovery of personal property (which Fredricks valued at over $13,333.36) in Gaslight's possession and for $40,701 in salaries earned by Fredricks after Brandt's appointment.

47. On September 10, 1984, the Committee filed an Amended Plan of Liquidation. Fredricks objected to the confirmation of this plan on or around October 23, 1984.

48. On November 9, 1984, Judge Toles entered a judgment against Fredricks for $13,333.36 plus interest based on Count III of the complaint. Execution of the judgment was expressly stayed pending the resolution of Fredricks' counterclaim.

49. On August 24, 1989, the Committee was granted leave to file an Amended Supplemental Complaint ("Amended Complaint"). Counts I–III of the Amended Complaint reflected the outcome of the claims presented in the original complaint. The remaining counts alleged: breach of fiduciary duty (Count IV); constructive and actual fraud (Counts V and VI, respectively); intentional interference with valid business relations (Count VII); and waste of corporate assets (Count VIII).

50. A trial was conducted on this matter during the period of September 23 to December 7, 1991. There has been no distribution to unsecured creditors.

### ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Fredricks maintains that Counts IV–VIII of the Amended Complaint should be dismissed because the original complaint (containing Counts I–III) was disposed of by final orders entered in 1984. Since the proceedings involving the original complaint were concluded, the complaint could not be amended. Fredricks further argues that

Counts IV–VIII do not relate back to Counts I–III, so they cannot amend the original complaint. Finally, Fredricks asserts that Counts VI–VIII are time barred.

## A. RELATION BACK

All parties concede that at the time the Amended Complaint was filed, there were no issues pending regarding Counts I and II of the original complaint. Count III was resolved by an order granting summary judgment in favor of the Committee on November 4, 1984 with execution of the judgment stayed pending resolution of Fredricks' counterclaim. Fredricks maintains that there was no complaint pending against him at the time the Amended Complaint was filed, so there was nothing for the later pleadings to relate back to. Thus the Court must consider whether Judge Toles' November 4 order was a final order.

 A final order terminates litigation on the merits, establishes the parties' obligations and leaves nothing for the court to do but execute the judgment. *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633–34, 89 L.Ed. 911 (1945); *Peterson v. Lindner,* 765 F.2d 698, 702 (7th Cir.1985). In contrast, if a judgment is only rendered with regard to a portion of the relief requested and further relief is specifically reserved, the judgment is not final. *Peterson,* 765 F.2d at 702. Judge Toles' November 4, 1984 order regarding Count III of the original complaint stated that "[e]xecution of the judgment shall be stayed until this Court disposes of [Fredricks'] pending counterclaim by final order." By its own language, the November 4th order was not final—further relief regarding Fredricks' counterclaim was expressly reserved. Because Count III was not resolved by final order, the complaint could be amended or supplemented.[6] Fed.R.Civ.P. 15(a), (d); *Matter of Unroe,* 937 F.2d 346, 349–50 (7th Cir.1991) (the court's equitable jurisdiction to permit amendments out of time does not conflict with, but rather fulfills the statutory backdrop for bankruptcy proceedings—

it is permissible to allow late claims as "amendments").

 According to Fredricks, even if Judge Toles' order was not final, relation back is inappropriate in this case. The purpose of relation back is to ameliorate the effect of a harsh limitations period if it can be done without prejudice or surprise to the opposing party. *Brown v. Providence Gas Co.,* 445 F.Supp. 459, 463 (D.R.I.1976). Rule 15(c) of the Federal Rules of Civil Procedure provides that an amendment of a pleading relates back to the date of the original pleading when the claim or defense asserted in the amended pleading arose out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading. Fed.R.Civ.P. 15(c)(2), incorporated by reference by Fed.R.Bankr.P. 7015. There is no requirement that the same substantive legal theory be advanced in both complaints. Rather, the amended complaint will be deemed timely if it arises out of the same conduct, transaction or occurrence as the original action. *Donnelly v. Yellow Freight Sys., Inc.,* 874 F.2d 402, 410 (7th Cir.1989), *aff'd in part,* 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990).

 The most important factor in determining whether an amended pleading should relate back to the original is whether the original pleading afforded the defendant sufficient notice of what he must defend against. *Hill v. Equitable Bank, Nat'l Ass'n,* 599 F.Supp. 1062, 1071 (D.Del.1984). Additionally, the court should determine whether a factual nexus exists between the original and amended complaints. *Grattan v. Burnett,* 710 F.2d 160, 163 (4th Cir.1983), *aff'd,* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). Where the amended complaint merely restates the factual allegations of the original complaint and claims that the conduct supports an additional theory of recovery, relation back is proper. *Miller v. Fairchild Indus.,* 668 F.Supp. 461, 464 (D.Md.1987). In contrast, a party cannot use relation back to bootstrap time barred claims onto viable actions where the claims are not based on the

---

**6.** The distinction between amended and supplemental pleadings is often disregarded for purposes of relation back and will therefore be disre-

garded in this discussion. *Federal Deposit Ins. Corp. v. Knostman,* 966 F.2d 1133, 1138–39 (7th Cir.1992).

same factual allegations. *Matter of Stavriotis*, 977 F.2d 1202, 1206 (7th Cir.1992) (holding that separate tax years imply separate tax claims, "[t]herefore a claim for 1982 taxes does not relate back to original claims for 1981 and 1984 taxes").

■ In this case, the original complaint alleged three instances of Fredricks' wrongful refusal to turnover property of the estate. Count I sought recovery of Gaslight's antiques and collectibles, Count II sought to recover an automobile owned by Gaslight, and Count III demanded turnover of interest paid on Fredricks' prepetition loans in violation of §§ 362 and 549 of the Bankruptcy Code. Thus the conduct, transactions and occurrences alleged in Counts I–III involved the recovery of the Debtor's property used by Fredricks in his capacity as officer or director of Gaslight. There was no allegation that Fredricks intended to harm Gaslight, its creditors or shareholders beyond his failure to timely turnover assets.

The Amended Complaint, in contrast, contains allegations of breach of fiduciary duty, fraud, falsification of reports, diversion of the Debtor's funds, forestallment of court proceedings, attempted entrenchment in Gaslight's management for personal gain and other egregious misconduct. To be sure, the knowing refusal to turnover property of the estate is wrongful conduct. However, the obstructionist activities alleged in the Amended Complaint go well beyond the scope of the allegations in the original complaint. The conduct alleged in the Amended Complaint is so factually dissimilar as to fail to afford Fredricks adequate notice that he must defend against it. The Court therefore concludes that the Amended Complaint does not relate back to the original.

## B. STATUTE OF LIMITATIONS

Because the Amended Complaint does not relate back to the original, the Court must determine whether Counts VI–VIII are time barred. Fredricks maintains that the Committee's claims are precluded by the five year limitations period applicable to all five counts. The Committee retorts that the claims accrued within the limitations period or, alternatively, that the statute was tolled by Fredricks' intentional scheme to defraud creditors.

■ A five year limitation of actions applies to claims for fraud, breach of fiduciary duty, intentional interference with valid business relations and waste of corporate assets. 735 ILCS 5/13–205; [7] *Luminall Paints, Inc. v. La Salle Nat'l Bank*, 220 Ill.App.3d 796, 163 Ill.Dec. 240, 244, 581 N.E.2d 191, 195 (1991); *McCarter v. State Farm Mut. Auto Ins. Co.*, 130 Ill.App. 97, 85 Ill.Dec. 416, 419, 473 N.E.2d 1015, 1018 (1985). The statute of limitations begins to run when the plaintiff knew or should have known through reasonable diligence of the existence of the right to sue. *Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir.1983); *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656, 665–66 (1969); *Matter of Estate of Krevchena*, 244 Ill.App.3d 160, 184 Ill.Dec. 873, 877, 614 N.E.2d 74, 78 (1993). Because Count VI for actual fraud is premised upon a narrower factual basis than the remaining claims, it will be addressed separately.

### 1. Actual Fraud

■ Fredricks was required to file financial statements with the Court in his capacity as debtor-in-possession. The Committee alleges that Fredricks wilfully, wantonly and with reckless disregard of Gaslight filed misleading reports containing false representations of material fact to conceal Gaslight's true financial status, and that Gaslight and others detrimentally relied upon the reports. Fredricks maintains that the limitations period for actual fraud began to run on August 30, 1983 when the responsibility of filing financial reports with the Bankruptcy Court was shifted to Brandt. Once the reports were filed, the Committee could and should have discovered any inconsistencies through reasonable diligence. Fredricks additionally argues that any falsifications were isolated

---

**7.** § 13–205 provides, in relevant part, that actions "to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within five years next after the cause of action accrued."

incidents separate from the other forms of misconduct alleged in the Amended Complaint. Further, the Debtor's disclosure statement (filed on November 16, 1983) indicated that Brandt and the Committee were aware of inaccuracies in the reports at that time. Since the claim was not filed until August 21, 1989, Fredricks argues that it is time barred.

The Court agrees. To be sure, the monthly and semi-monthly financial reports were not filed in a timely or complete fashion and they failed to reflect critical aspects of Gaslight's economic condition. The Committee and potential investors could have reasonably been misled by the documents' inaccuracies. However, the Amended Complaint did not allege that the false financial reports were part of a scheme to defraud creditors that continued through the duration of the case. Brandt discovered the flawed reports upon his appointment by the Court. Fredricks did not file any reports after he was replaced by Brandt as the designated party. Accordingly, the actual fraud claim accrued on August 30, 1983 and is therefore time barred.

### 2. Fiduciary Duty, Constructive Fraud, Interference with Business Relations and Waste

Fredricks maintains that his fiduciary responsibilities similarly ceased at the time he was replaced by Brandt as designated party. Thus Counts IV, V, VII and VIII (which rely in whole or in part upon the existence of a fiduciary relationship) accrued on August 30, 1983 as well. Alternatively, because the Amended Complaint alleges that Fredricks' conduct resulted in a withdrawal of various investors' support for plans of reorganization, Fredricks suggests that the claims accrued in February, 1984, when the Karkomi investors withdrew their support for the Committee's reorganization plan. Under either view, the Amended Complaint was filed more than five years after the claim arose.

■■■■ The Committee does not dispute that the Illinois limitations period for these actions is five years. Rather, the Committee maintains that Fredricks' misconduct tolled the statute. Statutes of limitations may be tolled due to the inequitable conduct of the parties. *Taylor v. Meirick,* 712 F.2d 1112, 1118 (7th Cir.1983) (statute of limitations may be tolled for fraudulent concealment); *In re Papa's Market Cafe, Inc.,* 162 B.R. 519, 524 (Bankr.N.D.Ill.1993). The tolling doctrines stop the statute of limitations from running even if the accrual date has passed. *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). The rationale is that wrongdoers should not be permitted to conceal their fraudulent acts and then use the statute of limitations as a defense. *Morgan v. Koch,* 419 F.2d 993, 997 (7th Cir.1969); *Papa's Market Cafe,* 162 B.R. at 524.

■■■■ Where fraud is undiscovered although the defendant has taken no affirmative steps to conceal the wrongdoing, the movant has the burden of proving due diligence and the exercise of reasonable care. *Suslick v. Rothschild Secs. Corp.,* 741 F.2d 1000, 1004 (7th Cir.1984); *Papa's Market Cafe,* 162 B.R. at 524. In cases where the defendant's conduct prevented the timely discovery and assertion of a claim, the plaintiff must also show that the defendant attempted to conceal the claim. *Morgan,* 419 F.2d at 997; *In re Bookout Holsteins, Inc.,* 100 B.R. 427, 430 (Bankr.N.D.Ind.1989). Here, the Committee maintains that Fredricks' scheme to defraud creditors in his fiduciary capacity tolled the statute. Accordingly, the Committee must prove that in spite of the exercise of reasonable care and diligence, it was unable to discover Fredricks' wrongdoings within the limitations period. *Morgan,* 419 F.2d at 997. The Committee has not met this burden.

The Committee had notice of a divergence between Fredricks' actions and the estate's interests shortly after the filing of Gaslight's bankruptcy petition. Zazove, as counsel for the Committee, was personally informed of Fredricks' lack of cooperation by Zavis in the spring of 1983 when Fredricks refused to discuss a proposal for the sale of the Gaslight clubs. In fact, Fredricks' failure to advance the reorganization process was one of the reasons why he was replaced as responsible party in August, 1983. Thus the Committee had actual notice of Fredricks' attempts to

thwart the reorganization process. The Committee cannot now argue that Fredricks concealed his actions or that it was unable to discover his wrongful conduct within the limitations period. Accordingly, the equitable tolling doctrine cannot be invoked to transform Counts IV, V, VII and VIII into timely claims.[8]

Alternatively, the Committee posits that Fredricks' breach of fiduciary duty, interference with Gaslight's business relations, waste of corporate assets and constructive fraud were continuous and ongoing misconduct. Each time Fredricks filed a baseless objection, interfered with the management of Gaslight's operations or refused to meet with investors interested in purchasing the clubs, the last date of injury was pushed forward in time. Accordingly, the Committee maintains that the causes of action did not accrue until October, 1984 when Fredricks objected to the Amended Plan of Liquidation, bringing the claims within the five year limitations period.

As a general rule, statutes of limitations do not begin to run on a continuing wrong until the wrong is over and done with. *Taylor,* 712 F.2d at 1118. The Committee argues that the wrongs alleged in Counts IV, V, VII and VIII were part of a pattern and practice of misconduct by Fredricks, so its claims did not accrue until the date of the last incident of wrongdoing. *Id.* at 1118–19; *Meadows v. Union Carbide Corp.,* 710 F.Supp. 1163, 1165 (N.D.Ill.1989). That the Committee knew or reasonably should have known of the claims while the misconduct was ongoing is therefore irrelevant. *Meadows,* 710 F.Supp. at 1166. Because the Amended Complaint alleged conduct occurring within the limitations period that was part of a continuing wrong that began outside the limitations period, the Committee argues that its claims are still viable.

The continuing wrong doctrine allows plaintiffs to reach back in time and yank otherwise time barred incidents (or their non-time barred effects) forward into the limitations period. *Alber v. Illinois Dept. of Mental Health & Developmental Disabilities,* 786 F.Supp. 1340, 1360 (N.D.Ill.1992), citing *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989). This rule strikes a balance between the plaintiff's interest in not having to bring successive suits and the goals of statutes of limitations—to bar litigation over claims arising in the distant past and to provide assurance that after a fixed period of time, people need not fear that their property will be taken by the legal process. *Taylor,* 712 F.2d at 1119.

A continuing wrong occurs when the first act was not a separate and completed wrong but simply the first step in a course of wrongful conduct. *Id.* In order to invoke the continuing wrong theory, plaintiffs must satisfy a two prong test. First, there must be a violation within the limitations period that would entitle the plaintiff to relief even if no other wrong had occurred. Second, it must have been unreasonable for the plaintiff to sue separately on each violation preceding the limitations period. *Malhotra,* 885 F.2d at 1310; *Alber,* 786 F.Supp. at 1361. The continuing wrong theory does not apply when the harm is definite and discoverable and where nothing prevented the plaintiff from coming forward and seeking redress at an earlier time. *Wilson v. Giesen,* 956 F.2d 738, 743 (7th Cir.1992). Put differently, if the plaintiff knows (or would have known through the exercise of reasonable diligence) shortly after an act occurs that it was wrongful and caused harm, the plaintiff cannot sit back, accumulate wrongful acts and sue on all of them at a later date by bootstrapping onto conduct occurring within the limitations period. *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282 (7th Cir.1993). Rather, the continuing violation doctrine is designed to attack a series of acts whose character only becomes apparent when viewed in light of later acts. *Id.*

Upon examination of the allegations contained in Counts IV, V, VII and VIII, the only conduct occurring within the limitations

---

**8.** As Fredricks notes, equitable tolling also does not apply to the claim for actual fraud because the filing of the financial reports was an overt act and the financial statements were public documents. A reasonably diligent creditor or investor could have discovered any inaccuracies. Accordingly, equitable tolling does not prevent the dismissal of Count VI.

period was Fredricks' objection to confirmation of the Committee's Amended Plan of Liquidation in October, 1984. The Bankruptcy Code expressly grants authority for a party in interest to object to the confirmation of a plan.[9] 11 U.S.C. § 1128(b). However, the Committee maintains that Fredricks' objections were part of a pattern of obstructionist activity to delay and hamper the bankruptcy proceedings, to divert Gaslight's orderly reorganization and to retain control of Gaslight for himself. As such, the Committee argues that Fredricks' objections, including his opposition to the Amended Plan of Liquidation, were made in bad faith, forcing Gaslight to unnecessarily expend vital funds in response.

 The Committee presented credible evidence showing that Fredricks actively attempted to block any sale of assets or reorganization plan that would not provide him with a role in Gaslight's management. Further, Fredricks filed objections (including the October, 1984 objection to the Amended Plan of Liquidation) with his own personal interests rather than those of the debtor at the forefront. However, the Court must find conduct occurring within the limitations period that is actionable when taken in isolation. *Alber*, 786 F.Supp. at 1360. Only then may prior acts be considered.

Fredricks' objection to the Amended Liquidation Plan, taken alone, is insufficient to support a cause of action against him. Fredricks was more than a mere disgruntled employee or ousted president. He continued to wear the hats of majority shareholder, director and control person throughout the proceedings. As such, he had a vested interest in Gaslight's fate and an accompanying right to object for any reason to any proposed plan disposing of Gaslight's assets. *In re Texaco Inc.*, 84 B.R. 889, 891 (Bankr. S.D.N.Y.1988) (any shareholder of the debtor may object to its plan of reorganization regardless of the shareholder's motives).[10] While it is tempting to conclude that absent a

consensus, the directors of a chapter 11 debtor must cause the debtor to support those plans that benefit creditors and shareholders roughly in accordance with the priorities of the Bankruptcy Code, such a rule would be pernicious and impossible to administer. A better rule would recognize the right of the board to object to a plan of reorganization on any grounds. Rule 9011 and the adversary process provide all the protection necessary to prevent harm from an inappropriate objection. Accordingly, Fredricks October 23, 1984 objection to the Amended Plan of Liquidation was not actionable under any theory of recovery. Because the Amended Complaint does not fulfill the first prong of the continuing wrong test, it must be dismissed for failure to state a claim.

## C. FREDRICKS' COUNTERCLAIM

Fredricks filed a counterclaim in response to the original complaint alleging that 1) Gaslight wrongfully retained Fredricks' personal property worth more than $13,333.36 in its possession; and 2) Brandt breached an agreement to give Fredricks a position with Gaslight for a minimum of three months at an annual salary of $150,000. The counterclaim sought recovery of the property (or its fair market value) and $40,701 in wages. The Committee denies having possession of Fredricks' personalty or that a three month minimum guarantee of paid employment existed.

With regard to the personal effects, Fredricks testified that these items were left in a locked closet at the Chateau Louise and that he possessed the key to the closet. Fredricks admitted that he was not physically barred from the Chateau Louise, that he never attempted to personally recover the belongings, and that he never turned over the key to an agent or to Brandt (as Gaslight's responsible party) so that someone else could retrieve the contents. The Committee denies that any of Fredricks' personal property is in Gaslight's possession. Fur-

---

**9.** The Committee does not specify whether the claims against Fredricks are premised upon his status as majority shareholder, director, or officer. Fredricks had standing to object to the plan no matter which role he was playing.

**10.** The Court further notes that no party ever requested at any time that Fredricks or his attorneys be sanctioned for any of his objections or appeals.

ther, the Court finds Fredricks testimony regarding the value of the personal effects in question to be not credible, and that the value of any misplaced property is de minimis. Accordingly, the $13,333.36 of postpetition interest will not be offset by any amount based upon Gaslight's alleged refusal to turn over Fredricks' personal property.

Second, the Committee denies that a three month guaranty of payment existed and retorts that Fredricks' employment was terminated for cause. At trial, Fredricks admitted that Brandt reduced his salary to $100,000 with Fredricks' consent. Fredricks also conceded that he never had an agreement with Brandt to guarantee his continued employment with Gaslight for any period of time. Further, in March, 1984, Fredricks filed a medical insurance claim stating that he has been totally disabled by emphysema since September 1, 1983. Thus Fredricks was physically unable to continue performance of his duties and responsibilities regarding Gaslight. Additionally, Fredricks failed to perform any services that were beneficial to the estate after his termination by Brandt. The Court concludes that Fredricks is not entitled to any salaries from Gaslight beyond those already received.

## CONCLUSION

The Court concludes that the Committee's Amended Complaint does not relate back to the original complaint filed on July 24, 1984, and that the Amended Complaint was filed outside of the statutory limitations period for each of the claims contained therein. Although the evidence indicates that Fredricks intentionally caused substantial harm to the Gaslight estate, the Committee failed to prove that the conduct was part of a continuing wrong or that grounds for equitable tolling of the limitations period exist. Accordingly, the Amended Complaint must be dismissed for failure to state a claim. The Court further concludes that Fredricks is not entitled to the relief sought in his counterclaim, so the Committee may presently recover $13,333.36 from Fredricks pursuant to Count III of the original complaint.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion entered on this date, IT IS HEREBY ORDERED THAT the Committee's Amended Complaint must be dismissed for failure to state a claim, that the relief requested in Fredricks' counterclaim is DENIED, and that the Committee may recover $13,333.36 from Fredricks pursuant to Judge Toles' November 9, 1984 order.