**Albert J. McDONALD, Plaintiff-Appellee-Cross Appellant,**

v.

**Robert W. O'MEARA et al., Defendants-Appellants-Cross Appellees.**

No. 72–1205.

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1973.

Rehearing Denied Feb. 27, 1973.

Certiorari Denied May 21, 1973.
See 93 S.Ct. 2293.

Murphy Moss, Charles C. Gremillion, New Orleans, La., for appellant.

Sidney W. Provensal, Jr., New Orleans, La., Victor A. Sachse, Baton Rouge, La., for appellee.

Before JOHN R. BROWN, Chief Judge, and RIVES and CLARK, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The question in this case is whether a sublessee of a Louisiana oil, gas and minerals lease who has specifically undertaken to defend the title of the lessor-sublessor can during the pendency of the sublease make a trade-out with those holding the known competing titles thereby giving him substantial advantages without accounting fully to his principal-lessors. The District Judge in this diversity suit held in the negative. We affirm.

### How It All Came About

The Wisner group claimed ownership to Lot No. 3. They granted an oil, gas and mineral lease to McDonald on a $\frac{1}{8}$ royalty basis, which expressly disclaimed warranty of title and imposed on the lessee McDonald very substantial obligations to actively defend at his sole expense their title against all adverse claimants—one of which was known to be the eventually successful Broussard title. Shortly thereafter McDonald subleased Lot No. 3 to O'Meara on the basis of a $\frac{1}{8}$ of $\frac{8}{8}$ overriding royalty. O'Meara expressly assumed McDonald's obligation to defend the title.

In the meantime Tidewater Oil Company,[1] unsuccessful in obtaining a lease from the Wisner group, secured one from the Broussards.

Finding O'Meara to be derelict in his duty to defend the Wisner title, McDonald subsequently declared the sublease forfeited and filed suit in state court to obtain a judicial decree to that effect. Within a week of McDonald's instigation of this suit O'Meara made a trade-out with Tidewater. Under the terms of the agreement O'Meara was to receive one-third of the working interest production after deducting all production costs and Tidewater two-thirds, subject to alteration when the validity of the legal title was ultimately adjudicated. Thus, O'Meara would receive a 29% net if the Broussard title was upheld, but only a 15% net if the Wisner-McDonald title prevailed.

As a sequel to the state court suit which terminated the O'Meara sublease, McDonald, for himself and the Wisner group, filed this suit (subsequently removed to federal court) seeking a declaratory judgment that by this double dealing O'Meara[2] had forfeited his claim to any benefits under the agreement and should hold all the benefits accruing to him from the Tidewater-O'Meara contract for McDonald-Wisner. The District Court found that O'Meara had indeed played both ends against the middle with his "Heads-I-win, Tails-you-lose" deal and granted a declaratory judgment for McDonald. We affirm.

### The Unfaithful Servant

When the Wisners first leased the lot in question to McDonald they were fully aware of the impending challenge to their title. Thus, after disclaiming any warranty of title, part and parcel of the deal with McDonald was an express assumption on his part of the defense of the Wisner title. This was spelled out in detail in a contemporaneous letter. McDonald subsequently subleased the lot to O'Meara retaining a $\frac{1}{8}$ overriding royalty. McDonald also exacted from O'Meara a specific undertaking to carry out McDonald's obligation to protect and perfect the Wisner title.[3]

---

1. Tidewater is now Getty Oil Company.

2. Tidewater and the First City National Bank of Houston are also defendants.

3. The McDonald-O'Meara sublease provided:

  5. O'MEARA takes cognizance of the existence of that certain agreement by

Meanwhile, Tidewater Oil Company had taken a mineral lease from one Felix P. Broussard on this same lot. Notwithstanding his awareness of the Wisner-McDonald claim to the legal title to this property, O'Meara allowed Tidewater to cross another lot owned by him and commence drilling operations on the lot in question on June 8, 1956. Although he was bound to take affirmative action to protect the Wisner title, O'Meara did not invoke legal processes to stop this drilling or challenge Tidewater's (Broussard) claim until October 19, 1956. On that date he succumbed to McDonald's repeated demands for action by filing suit against Broussard.

O'Meara's procrastination and lackadaisical prosecution of the case subsequently caused McDonald to declare the sublease terminated. On November 14, 1956 this was followed by his suit in the state court to obtain a judicial declaration of the termination of the sublease.

Just six days later the O'Meara-Tidewater trade-out agreement was consummated.

McDonald—still ignorant of the trade-out and thus unaware of the relationship between his putative sublessee and the adverse claimant—continued his own cancellation suit against O'Meara with one hand and took on O'Meara's burden in the suit against Broussard with the other. While the results of both of these lawsuits are helpful in our efforts to paint the cosmic picture, the state court's resolution of McDonald's suit against O'Meara is particularly pertinent—and at points completely decisive—to the precise issues presented for our determination.[4]

### O'Meara A Double Dealing Defaulter

The opinion order of the 17th Judicial District Court, Parish v. Terrebone (Division B), State of Louisiana, in McDonald v. O'Meara (No. 17.233)[5] pulled

---

and between the Lessors named in the aforesaid original lease (Eugene F., and Russell C. Viquerie, Et Al.,) and Albert J. McDonald, whereby the latter has been duly appointed and designated as Agent and Attorney-in-fact of the aforesaid Lessors:

"to make such demands, to give such notices and to assert, protect and defend the ownership and possession of the hereinabove described property, to his or their names, whether jointly or severally, and in their place and stead, to do all things meet and proper, for the said assertion, protection and defense of the rights of the parties hereto, it being thoroughly understood and agreed by the Party of the First Part (Lessors) and the said McDonald that all necessary expenses, for surveys, attorney's fees, court costs or other expenses incident to the assertion, protection and defense of the ownership and possession of the hereinabove described property shall be borne and defrayed by the said McDonald and that said McDonald shall save harmless the Party of the First Part for all liability in connection herewith."

a copy of said agreement being attached hereto and made part hereof for reference.

It then provided:

"Robert W. O'Meara acknowledges that the foregoing considerations and stipulations are binding upon himself, his heirs, executors, administrators, successors, and assigns and that, had the foregoing considerations and stipulations not been included herein, Albert J. McDonald would not have entered into this agreement."

4. In the suit against Broussard, the Louisiana state court held, in O'Meara v. Broussard, La.App., 1963, 162 So.2d 777, *writ denied*, 1964, 246 La. 373, 164 So. 2d 360, that the Wisners had no valid legal claim to the title of the lot in question. The question of who holds legal title is apparently still unresolved at this juncture with litigation pending between Broussard and the Louisiana Land and Exploration Company. We expressly decline to voice any opinion as to the ultimate resolution of this question.

Since O'Meara's liability here is premised, not upon the rents and royalties flowing out of a valid estate, but rather upon the breach of the fiduciary duty, the invalidity of the Wisner title is not decisive.

5. This judgment became final when O'Meara's appeal was dismissed as untimely. McDonald v. O'Meara, La.App., 1962, 149 So.2d 611.

no punches with respect to O'Meara's conduct. The court found that, "not only did he fail to give any assistance toward the proper disposition of the trial of this case on the merits so that this court might know the actual truth, regardless of legal technicalities, but he fought and resisted even the taking of testimony of other people, such as officials of Tidewater."

Finding that O'Meara stood in a fiduciary relationship to McDonald which he had failed to recognize, the court concluded that he should and "could not morally or lawfully acquire any interest adverse to McDonald." The court was particularly impressed, in this regard, by O'Meara's conduct *vis a vis* McDonald's rights and the conduct of Tidewater.

"Not only did O'Meara fail to fight back at Tidewater in protecting the rights of his sublessor (and at the same time protect the Wisner rights), but he cooperated with Tidewater by permitting Tidewater to go through his own canal in Lot 4 in order to explore on the property involved in this lawsuit."

The Louisiana court found that O'Meara then added injury to insult by making the written agreement with Tidewater "to settle the dispute between O'Meara and Tidewater concerning the subleased Wisner property (Lot No. 3) and by doing so O'Meara obtained a personal advantage. This advantage did not inure to the benefit of McDonald, lessor of his sublesee O'Meara, and, as such, the contract between O'Meara and Tidewater was a breach of trust and duty, and in plain violation of the sublease." Summing these facts up, the Louisiana court found that "O'Meara fully contemplated and intended to take advantage of this situation, and that his attempts failed because of McDonald's diligence." Therefore, the court rendered judgment cancelling the McDonald-O'Meara sublease and reserving a right in McDonald to sue for damages.[6]

### The Day of Reckoning

In the Federal Court suit below, the district court held the judgment of the state court to be collateral estoppel on the issue of breach of a fiduciary duty. We think that this was clearly correct.

■ Louisiana law permits—indeed, requires—the use of the doctrine of collateral estoppel to prevent the relitigation of issues where the following circumstances exist: (i) the issue in the subsequent suit must be identical to the one involved in the prior action, (ii) the issue must have been actually litigated in the prior action and (iii) the determination of the issue in the prior action must have been necessary and essential to the resulting judgment. See California Co. v. Price, 1957, 234 La. 338, 99 So.2d 743; Williams v. Marionneaux, 1960, 240 La. 713, 124 So.2d 919; Cauefield v. Fidelity and Casualty Co. of New York, 5 Cir., 1967, 378 F.2d 876; Friedenthal v. General Insurance Co. of America, 5 Cir., 1968, 395 F.2d 202; City of New Orleans v. United States, 5 Cir., 1967, 371 F.2d 21. The question of whether O'Meara had breached a fiduciary duty to McDonald was certainly necessary and essential to a holding that the sublease should be cancelled. There is no question that it was litigated, and it is the *crucial* issue in the present declaratory judgment action. The trial court was thus correct in applying the Louisiana-accepted doctrine of collateral estoppel.

Central to the federal court's holding that the O'Meara-Tidewater agreement of November 20, 1956, was repugnant to

---

6. "It is ordered . . . that there should be judgment herein in favor of plaintiff . . . termina*ting* and cancel*ling* the oil, gas and mineral lease from Albert J. McDonald to Robert W. O'Meara . . and it is further ordered . . . that there be reserved to Albert J. McDonald all of his rights to sue defendant . . . for all damages and expenses incurred by [McDonald] as a result of defendant's violation of the terms of the sublease herein cancelled."

the fiduciary duty owed by O'Meara under the sublease was its determination that for the purposes of mutual duties of lessor-lessee the sublease was effective until September 9, 1961, when the opinion-judgment in the cancellation suit was rendered by the state court (see note 5, *supra*).

■ The date the decree became effective or the date which the decree regarded as significant is, of course, a matter of state law. The state court's judgment was, significantly, cast in the present tense—"that there should be judgment . . . terminat*ing*, and cancell*ing*" (emphasis added). We hold that the conclusion of the federal court was permissible under the prevailing Louisiana authority, especially since, as the Judge pointed out, equitable considerations are recognized, even by Louisiana's civil law, to allow a court to consider what result would obtain under variable dates. See Fontenot v. Sunray Mid-Continent Oil Co., La.App., 1967, 197 So.2d 715, 722; Sellers v. Continental Oil Co., La.App., 1966, 188 So.2d 466.

This conclusion is further supported by other factors. First, O'Meara himself put forth a strident defense of his rights under the sublease for nearly five years. Second, Tidewater referred specifically to the lease conferring rights on O'Meara when it made the trade-out agreement on November 20, 1956—six days *after* McDonald had filed suit to cancel the lease. Third, the existence of the McDonald lease was recognized in the transactions between O'Meara, Tidewater and the Bank.

■ To the extent that it was not already foreclosed by collateral estoppel, the federal court's conclusion that O'Meara's actions were a breach of his fiduciary duties, the finding by the Judge of O'Meara's duplicity, was amply supported. It came down to a simple question of arithmetic. Under the trade-out, if the Wisner title prevailed—the objective to which O'Meara had bound himself and his successors—O'Meara's interest was roughly 15%. On the other hand, if he pulled punches, or did nothing in his duty to Wisner-McDonald so that the Broussards would be victors, his interest would be 29%.[7]

7. Judge Heebe poignantly demonstrated the patent conflict of interest inherent in the O'Meara-Tidewater Agreement:

"Ordinarily, the landowner receives ⅛ of the total production, or 12% as a royalty. The agreement between Tidewater and O'Meara provided that (1) in the event the Broussard title prevailed, Tidewater would pay ⅔ of the ⅛ royalty (or 8% of total production) and O'Meara ⅓ of the ⅛ royalty (or 4% of total production), and (2) in the event the Wisner title prevailed, Tidewater would pay ⅔ of the ⅛ royalty O'Meara had granted to McDonald (or 8% of total production), O'Meara would pay the remaining ⅓ or (or 4% of total production) plus the full ⅛ royalty owing to the Wisners (or 17% of total production) for a total royalty payment obligation of ⅓ of ⅛ plus ⅛ (or 4% to McDonald plus 17% to the Wisner Group, totaling 21%). However, there was a proviso in the agreement that Tidewater would pay the excess whenever O'Meara's royalties added up to more than 18% of total production.

"Thus, after the confection of the agreement between Tidewater and O'Meara, O'Meara was entitled to 33% of the total production minus his royalty payment obligations. If the Broussard title prevailed, O'Meara's royalty obligation amounted to only 4% (i. e., ⅓ of the ⅛ royalty owed to Broussard), leaving him 29% of total production (33% minus 4% = 29%). If the Wisner title prevailed, O'Meara's royalty obligation amounted to 18%, leaving him only 15% of total production (33% minus 18% = 15%).

"Clearly then, once O'Meara had made his deal with Tidewater, it was no longer in his best interest to win for the Wisners and, as the state court found, he in fact did not properly pursue the perfection of the Wisner title. See Finding of Fact No. 7, *supra*.

"McDonald did not learn of the agreement between Tidewater and O'Meara until the trial of his suit against O'Meara to cancel the sublease." Finding of Fact 8. (App. 357-58).

## The Scope Of The Remedy

While we uphold the trial court's conclusion and thereby that of the Lousiana state court that should enunciate the noble principles which its Civil Law compels, there is a serious question of how far the decree should go. The trial court declared that whatever O'Meara was entitled to receive under the terms of the trade-out should be delivered by O'Meara to McDonald-Wisner.[8] In other words, whatever O'Meara got, he must deliver. As this bears directly on the extent to which an equity court in the civil law atmosphere may go, we called for post-argument supplemental briefs on issues which the court raised on its own.[9]

Of the many possible permutations there are three plausible alternatives: (i) McDonald can recover *all* sums due to O'Meara under the agreement; (ii) McDonald can recover 29% of the *entire* production; or (iii) McDonald can recover 29% of the *net* amount due to O'Meara.

Under the terms of the Wisner-McDonald lease, the Wisner group retained a ⅙ royalty (roughly 17%). In his sublease McDonald reserved to himself a ⅛

out of ⅝ overriding royalty (roughly 12%). Thus, prior to the O'Meara-Tidewater trade-out, O'Meara had a 71% working interest subject to royalty obligations of 29% (17% + 12%) to McDonald and the Wisner group.

Under the terms of the O'Meara-Tidewater agreement O'Meara is to receive 33⅓% of total production (subject to his obligation to make royalty payments, see note 7, *supra*). In response to our inquiry O'Meara for the first time strenuously contends that, if McDonald is entitled to anything at all, the maximum amount receivable by McDonald would be 29% of O'Meara's net. The rationale behind this formula is that since McDonald bases liability upon the duty founded in the sublease, McDonald should get no more than his percentage share of O'Meara's net proceeds had the Tidewater trade-out been openly negotiated.

On the other hand, McDonald-Wisner urge that they should have either (i) all of O'Meara's share (33⅓% of 100%) or (ii) 29% of 100% production (without deduction for expenses) and certainly not 29% of O'Meara's Tidewater share.

---

8. We deal separately with the *in personam* obligations of Tidewater and the Bank.

9. As illumined by oral argument we posed the problem to counsel in this way:
"On McDonald's theory, O'Meara, under a sublease which continued until cancelled as of the date of the Louisiana District Court judgment, had to account to his principals (the McDonald-Wisner lessor group) for what he got from Tidewater. The question, however, is whether through equitable constructive trust (or the civil law characterization of "fraud") the lessor group (Wisner-McDonald) would be entitled to *all*, or merely such portion as they would have received had O'Meara openly negotiated the Tidewater agreement on behalf of all, (Wisner, McDonald, O'Meara). If the McDonald-Wisner group are to have something less than *all that* O'Meara obtained, what would be the amount, stated, for example, in percentage or fractional terms under the Wisner lease

(⅙ royalty) or the McDonald sublease (⅛ of ⅝)? Although the McDonald's theory presumably is not to assert against O'Meara in this action the provisions of the McDonald sublease as such, on what basis can it be concluded that had O'Meara openly procured the Tidewater title trade-out (⅔ to Tidewater, ⅓ to O'Meara) for all the Wisner-McDonald-O'Meara group, O'Meara would come out with *none* of the benefits even though the sublease—which gave rise to the duty of fair dealing—gave O'Meara approximately 71% of the working interest, on the one hand, and gave the lessor group (Wisner-McDonald et al) not over an aggregate 29% of the minerals. Query: Should Wisner-McDonald obtain 100% of O'Meara's ⅓ or just 29%, or some other amount?"
We use the integer figure of 29% for convenience. Under the combined Wisner-McDonald-O'Meara lease it actually was 29.17%. This corrected figure is to be substituted wherever essential.

■ Because the liability derives from O'Meara's breach of trust the measure of recovery is limited by his contractual entitlements. We thus hold that McDonald-Wisner is entitled to recover all sums due to O'Meara under the terms of the trade-out. (Coincidentally, this corresponds almost exactly with the 29% of 100% to which they would have been entitled from the lease-sublease had their title prevailed. See note 7, *supra*).

■ The issue is simple. The servant having substantial, not ordinary, obligations breaches his duty and as a part of his breach makes a trade which benefits himself no matter how things turn out. The Louisiana law with that wondrous certainty indigenous to the civil law [10] and sometimes, but not always, a part of the common law,[11] requires that whatever the agent servant/fiduciary wrongfully acquires during the fiduciary relationship must be disgorged completely, once and for all.[12]

■ Oft-times this may result in an apparent prejudice to a conscientious fiduciary whose conduct—independent of personal motives—does not measure up to the law's high demands. Behind the law's demands is the judgment that the difficulties in apportioning or alllocating the fruits of possible self-dealing are on the defaulting fiduciary. The burden is on him to demonstrate that applica-

---

10. Codal Article 3005 of Louisiana provides that an agent "is bound to restore to his principal whatever he has received by virtue of his procuration, even should he have received it unduly."

The test under Article 3005 does not hinge on a conventional principal-agent relationship, but rather upon the existence of a duty. The remedy is a total accounting of all profits:

"Every one, whether designated agent, trustee, servant, or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose, must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. . . . He will be required to account to his employer for any gift, gratuity, or benefit received by him in violation of his duty, or any interest acquired adverse to his principal without a full disclosure, though it does not appear that the principal has suffered any actual loss by fraud or otherwise."

Texana Oil & Refining Co. v. Belchic, 1922, 150 La. 88, 102, 90 So. 522, 527. See Neal v. Daniels, 1950, 217 La. 679, 47 So.2d 44; Robinson v. Commercial Cattle Co., La.App., 1955, 82 So.2d 108.

The technical absence of a constructive trust under Louisiana jurisprudence is no bar to the remedy we impose here. See Mansfield Hardwood Lumber Co. v. Johnson, 5 Cir., 1959, 268 F.2d 317, cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120.

11. See Nye v. Lovelace, 5 Cir., 1956, 228 F.2d 599; United States v. Bowen, 5 Cir., 1961, 290 F.2d 40. Cf. Bishop v. United States, 5 Cir., 1959, 266 F.2d 657; Standard Oil Co. of Texas v. United States, 5 Cir., 1962, 307 F.2d 120; Beaudine v. United States, 5 Cir., 1966, 368 F.2d 417. See generally Restatement (Second) of Agency, §§ 389, 403, 407.

12. Since McDonald's recovery is derivatively determined on the basis of O'Meara's Tidewater contractual entitlements, his recovery may be limited by future developments in the continuing dispute over the title to Lot No. 3. Indeed, O'Meara, Tidewater and the Bank have made much on this appeal of the fact that, because of the still pending litigation between Broussard and the Louisiana Land and Exploration Company, see note 4, *supra*, that no funds are currently due to O'Meara under the terms of the trade-out. But this is really inconsequential.

We hold today that O'Meara is bound to disgorge whatever he has received, is receiving, or will receive from the course of his double dealings. If the Broussard title prevails and O'Meara would have been entitled to his full 33⅓% share (less royalty obligations), then McDonald will recover all of that amount. If the Louisisana Land and Exploration Company prevails over Broussard (Tidewater) and O'Meara would have been entitled to nothing under the terms of the trade-out, then McDonald, too, will take naught.

tion of the usual rule will produce a real injustice.

Since O'Meara has not sustained that burden, his entitlements from the Tidewater agreement are solely for McDonald-Wisner.

We quite agree with McDonald that as a hypothetical possibility suggested in the Court's post-argument inquiry (note 9, *supra*) there would be no way now to determine what McDonald-Wisner might have agreed to had O'Meara openly negotiated a protective lease with Tidewater. That impossibility is just another risk which a secret self-dealing agent runs and for which the law's reflex is to make the agent disgorge what he got.

### It's Not Over Yet

Having determined the extent of O'Meara's ultimate liability we must determine what role Tidewater and the Bank are to play in the pageant.

The Bank formed a tri-partite agreement with O'Meara and Tidewater on July 25, 1962, by which it agreed to accept from Tidewater certain sums of money up to $150,000 for the account of O'Meara. The arrangement presumably came into being to get O'Meara some of the fruits of his private trade since Tidewater had suspended payments because of the title litigation.

Although holding O'Meara fully accountable, the trial Judge declined to declare the Bank and Tidewater personally liable. He did this on the ground that each was acting in good faith. But each knew of O'Meara's obligation to protect the Wisner title and Tidewater, by simple calculations (see note 7, *supra*) could see that by accepting the Tidewater agreement O'Meara was compromising his duty. The Bank is little better off. Indeed, its role was to permit O'Meara to cash in on the trade and its agreement to reimburse Tidewater showed that all were aware of the risks.

In any event, good faith is not relevant as between principal and agent, nor should it be as to those who knowingly make agreements with the defaulting agent which constitute a breach of that trust.

Consequently we modify the District Court's judgment to impose personal liability on each.

As to the Bank the matter is simple. Whatever it has received from Tidewater and has paid over or is being held to pay over to O'Meara must be reimbursed to McDonald.

As to Tidewater some complications might exist suggesting that the details of *in personam* liability fixed by us should be worked out as necessary on remand by the District Court. This does not disturb the finality of the decree as between McDonald and O'Meara or that against the Bank. Nor does it in any way whatsoever alter or affect the decree against Tidewater as rendered by the District Court and now affirmed by us.[13]

One thing bears emphasis. Since we hold that Tidewater bears the same legal consequences as does the unfaithful agent it follows that McDonald not only gets all of the *fruits* of the trade-out, he gets the contract as well including (since Tidewater is a party to this suit) the standing of a party to the contract with the right to sue Tidewater with or without joinder of O'Meara. Conversely, O'Meara has no power to alter, modi-

13. It is a little difficult to discern why personal liability of Tidewater is of any significance. Under the decree whatever Tidewater has received (retained) or will hereafter receive (retain) from production on the lot which constitutes all or part of O'Meara's share under the trade-out is not to be paid to O'Meara but is to be paid to McDonald. So far as amounts held in abeyance by Tidewater or dis- tributable in the future are concerned the decree already imposes a direct personal responsibility on Tidewater. For all practical purposes so-called personal liability seems to be confined to payments or advances either to O'Meara, the Bank, or both. And as to them we have determined that such amounts must be made good (with appropriate interest) by Tidewater to McDonald.

fy, rescind or terminate that agreement. Nor has Tidewater.

As court-imposed, equitably-contrived beneficiaries of O'Meara's contract with Tidewater, McDonald-Wisner are entitled to expect equitable and direct dealing from Tidewater. No subsequent negotiations which in any manner, shape or form compromised the claims of McDonald-Wisner under the Court's holding today would bind McDonald-Wisner absent their consent.

With these vast powers and rights vested and effective now in McDonald framing the *in personam* decree may be little but a formality. But the District Court is in a better position than we are to assay and then care for contingencies which might impose on Tidewater responsibilities and consequences beyond those now fixed by us.

Modified, and as modified, affirmed with remand.