Patrick **ROCHOW**, Personal Representative of the Estate of Daniel J. Rochow, Plaintiff,

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA,** Defendant.

Case No. 04-73628.

United States District Court, E.D. Michigan, Southern Division.

March 23, 2012.

John J. Cooper, Cooper Law Firm, Troy, MI, for Plaintiffs.

John D. Pirich, Brian T. Quinn, Honigman, Miller, Lansing, MI, for Defendant.

## ORDER SETTING METHOD OF ACCOUNTING

ARTHUR J. TARNOW, Senior District Judge.

Before the Court are the competing position statements of Plaintiff and Defendant with regard to the proper method of determining equitable accounting. This accounting is for the purpose of correctly determining the amount of unjust enrichment derived by Defendant from the wrongful withholding of disability benefits to Plaintiff, so that Defendant may disgorge said profits as previously ordered by this Court. For the reasons stated below, the Court finds that Defendant has failed to rebut Plaintiff's method of accounting

and has failed to justify various offsets to the amount of profits to be disgorged.

## I. Background

This case stems from the wrongful denial of disability benefits for Plaintiff Daniel Rochow ("Rochow") by Defendant LINA. On June 24, 2005, this Court granted Plaintiff's Motion for Summary Judgment [12], finding that Defendant LINA had acted arbitrarily and capriciously in denying Plaintiff benefits under LINA's long-term disability plan. This Court's order granting summary judgment was affirmed in *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860 (6th Cir.2007). Subsequent to the mandate from the Sixth Circuit Court of Appeals, Plaintiff filed his Motion for an Equitable Accounting [46] on November 10, 2008. Argument was heard on this motion on February 5, 2009, and in an Order [67] issued on June 16, 2009, the Court found that an equitable accounting and disgorgement by Defendant was an appropriate remedy.

On August 23, 2010, Defendant [88] and Plaintiff [89] submitted position statements regarding the method the court should use to calculate the amount of unjust enrichment derived by Defendant from its wrongful withholding of benefits to Plaintiff. Both Defendant [91] and Plaintiff [92] submitted responses. On November 4, 2011, the Court held an evidentiary hearing regarding the parties' positions. Plaintiff [106] and Defendant [105] submitted supplemental briefs on November 18, 2011. On February 3, 2012, the Court heard additional argument regarding the parties' positions on the proper method of equitable accounting.

## II. Analysis

■ Unjust enrichment is the principle that "a fiduciary may not profit by his breach of the duty of loyalty." *Amalgamated Clothing Workers v. Murdock*, 861 F.2d 1406, 1411 (9th Cir.1988). In this case, it has already been determined that Defendant owed Plaintiff a duty of loyalty and breached this duty through its arbitrary and capricious denial of disability benefits to Plaintiff. Defendant has, in whole or nearly in whole, already paid to Plaintiff the actual amount of benefits that were wrongfully withheld. Thus, the question before the Court is the amount of financial benefit that Defendant derived from withholding benefits to Plaintiff. As set out in this Court's Order [67] requiring an equitable accounting and disgorgement by Defendant, Defendant is required to remit any profits derived from Plaintiff's wrongfully withheld benefits. The parties have provided extensive briefing on how the Court should arrive at this amount, and have had two opportunities to argue their positions before the Court.

### A. Burden of Proof

An equitable suit for accounting is tried in two stages. First, the party seeking accounting must establish that there is a right to an accounting. Am.Jur.2d *Accounts and Accounting* § 66 (2005). This Court has already found that Plaintiff has a right to an accounting. Once this right has been established, Plaintiff must produce evidence from which the Court can make a "reasonable approximation" of Defendant's unjust enrichment. If a Plaintiff cannot provide a reasonable approximation, the claim of unjust enrichment is merely speculative and disgorgement will not be allowed. However, this "reasonable approximation" is not a high burden. In *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231–32 (D.C.Cir.1989), the Court of Appeals for the D.C. Circuit held that a showing of the "actual profits" on tainted transactions presumptively shifted the burden to the defendants to demonstrate why the approximation provided by the plaintiff (the defendant's actual profits) was not a reasonable one. Similarly, in *Nickel v. Bank of Am.*, 290 F.3d 1134 (9th

Cir.2002), a bank (later acquired by Bank of America) improperly charged $24,000,000 in fees to various trusts. The Ninth Circuit Court of Appeals found that the district court's focus on the "speculative" nature of the disgorgement in question was incorrect. The court found that focusing on questions of traceability simply insulated the wrongdoer, the bank, and violated a rule of restitution, namely "if you take my money and make money with it, your profit belongs to me." *Id.* at 1138. The court also found that if the manner in which the bank had utilized the money was not traceable, there was a presumption that the bank was deriving profit from the funds. Thus, an appropriate remedy was a proportional share of the bank's profits for the period the funds were utilized. *Id.* at 1139.

Once a reasonable approximation has been provided, the accounting process proceeds to the second stage. The burden at this stage switches to the party "in control of the books" who has "[t]he burden of proving the correctness of an account." Am.Jur.2d, *Accounts and Accounting* § 66 (2005). Defendant has the burden of proving the correctness of its accounting and methodology of disgorgement because "every reasonable doubt is resolved in favor of the party wronged." George E. Palmer, The Law of Restitution § 2.14, 180 (1978).

▪ Defendant argues that "a plaintiff seeking disgorgement of profits is not entitled to defendant's general profits where it is possible to identify which of the defendant's profits flowed from the wrongdoing." Def.'s Br. at 5.[1] While true, it is Defendant's burden to demonstrate which profits flowed from its wrongdoing; it is not the burden of the Plaintiff. *See Nickel,* 290 F.3d at 1138 ("the problem of showing where the money went is the tortfea-

sor's problem"). Defendant has failed to do that here.

In similar cases, courts have required violators to return "all profits" that derive from the tainted activity. *See SEC v. First City Fin. Corp.,* 890 F.2d at 1232 (requiring defendant to return all profits derived from tainted trades when defendant could not provide precise measure of profits derived from illegal trading). Similarly, analyzing a Louisiana law, the Fifth Circuit has ruled that "the burden is on [a fiduciary] to demonstrate that application of the usual rule [of complete disgorgement of profit] will produce a real injustice." *McDonald v. O'Meara,* 473 F.2d 799, 805–06 (5th Cir.1973). In *Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984), the court placed the burden of accounting on the defendant, an ERISA fiduciary. The court, finding that there would be little reason to require restitution under ERISA's remedial provision, 29 U.S.C. § 1109(a), if "beneficiaries confronted an insurmountable obstacle in proving the extent of a fiduciary's profits," and placed "the burden of proof on the defendants here to ensure that the disgorgement remedy is effective." *Leigh,* 727 F.2d at 139; *see also Connelly Mgmt. Emp. Welfare Benefit Plan v. N. Am. Indemnity, N.V.,* 2008 WL 1336085 (S.D.Ind. Apr. 8, 2008) ("the burden shifts to the defendants to show that commingled trust assets are not 'profits' subject to ... disgorgement ...") (citing *Leigh,* 727 F.2d at 138–139).

**Reasonable Approximation**

Defendant contends that Plaintiff has failed to present a "reasonable approximation" of the unjust enrichment because Plaintiff has not shown a "casual connection between LINA's withholding of benefits and a measurable increase in LINA's

---

**1.** References to Plaintiff's and Defendant's briefs refer to their position statements, dock-

et numbers [88] and [89].

profit." Def.'s Br. at 3. Defendant compares the situation to one described in *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir.1983), wherein the Seventh Circuit Court of Appeals stated that "[i]f General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringers' profits." The comparison to *Taylor* is inapposite. In *Taylor*, the plaintiff failed in any way to attempt to determine what portion of the defendant's sales were derived from the use of plaintiff's product, and instead simply created a percentage of the defendant's profits that the plaintiff claimed entitlement to. That is not the case here. Here, the amount of wrongfully withheld funds are already known.

At the hearing held on November 4, 2011, Plaintiff set forth a reasonable approximation of the unjust enrichment gained by Defendant through the withholding of benefits to Plaintiff. Plaintiff did so by calculating the amount of wrongfully-withheld principal, $910,629.24, which includes base interest on the principal, and then assumed that this figure, gradually accumulated over time by Defendant, was part of Defendant's general equity and used for all corporate purposes. Plaintiff then calculated Defendant's of profit rate during this period, compared the percentage gain to the amount of principal owed to Plaintiff, and arrived at an approximation of $2.1 million dollars of unjust enrichment on the part of Defendant.

Based on general principles of accounting, the burden then shifts to Defendant to provide some reason why this approximation is not reasonable.

### Defendant's "Investment Account" Defense

Defendant's theory regarding why Plaintiff's approximation is not reasonable is that the money owed to Plaintiff was confined to an "investment account" which limited its use and the profits derived from the use of the money. Defendant asserts that it places money in these investment accounts, for instance in the following excerpt from Defendant's position statement:

> When LINA receives premiums from its customers, those premiums are invested in securities to generate investment income while providing the necessary liquidity to meet cash flow requirements and pay claims ... [i]f claims were not paid in a timely manner, those funds remained in the investment portfolio longer than initially expected and generated increment income—*i.e.*, the causal connection ... [t]he retained investment income totals $32,732.

Def.'s Br. at 6.

However, at the hearing held on November 4, 2011, it became clear that the idea of an "investment account" within which the money that Defendant unlawfully withheld from Plaintiff was kept segregated from Defendant's general account was inaccurate. The following is an exchange between Plaintiff's counsel and Timothy. Holzli, Defendant's expert witness and Chief Accounting Officer of the Group Insurance Division at CIGNA Corporation, Defendant's parent company:

Q. All right. There is a procedure at LINA for setting up a segregated account, is there not?

A. What do you mean by "segregated account"?

Q. An account that is separated off from the rest of LINA's investment funds.

A. You used the term there is a separate account, which is a specific terminology.

Q. But that would be : segregated, wouldn't it?

A. A separate account is a segregated account, yes.

Q. And if that were done and the withheld benefit payments simply filed up in that account, and that account earned interest say from a bank that was added into the account, we could simply go to the bank or go to the account, check the records, see what the principal was and see what it earned over the time it wasn't paid. Mr. Rochow could take that and we would be done. Is that right?

A. Correct.

. . .

Q. All right. In Mr. Rochow's case, LINA didn't establish a segregated—or, a separate account until it actually started paying his benefits, correct?

A. Are you referring to a separate account now?

Q. Yes.

A. The policy that Mr. Rochow's employer had with LINA was a general account obligation. So, there would have never been a separate account established under that type of policy.

Q. Okay. During the time period between 2002 when the claim was filed and late 2007 when LINA started paying on it, did LINA in any way earmark or segregate the money associated with Mr. Rochow's claim?

A. There's never a segregation in the general account assets, of assets to a specific beneficiary.

Q. How about earmarking?

A. Not in the general account assets, no.

THE COURT: Could it go to a reserve?

A. The only reserve that would have been established at that time, Your Honor, would have been the incurred, but not the full reserve, which is in the aggregate.

THE COURT: But that would be part of the aggregate at some point or not?

A. Yes, it would.

THE COURT: Okay.

Q. And as you sit here today, can you rule out the possibility that a portion of the funds LINA owed Mr. Rochow were used to pay for LINA's ongoing operating expenses?

A. No.

Q. Okay. And I would like to talk then about some of the outflows from the investment account.

Is it fair to say that LINA will be paying operating expenses out of the investment account?

A. That's normally how the process in an insurance company works, yes.

Tr. of Nov. 4, 2011 Hr'g at 119–23.

Thus, it appears that repeated references by Defendant to an "investment account" from which to pay claims out are not accurate, or at least are not accurate with respect to the money that should have been paid to Plaintiff. Defendant's expert admitted that the money withheld from Plaintiff was not segregated in any manner but would have been present in a general fund from which Defendant could pay out other claims or even general operating expenses. This seems to be precisely the situation described in *Connelly Mgmt. Emp. Welfare Benefit Plan,* 2008 WL 1336085, at *12 (S.D.Ind. April 8, 2008) ("the burden shifts to the defendants to show that commingled trust assets are not 'profits' subject to . . . disgorgement . . ."). Finally, this seems to be precisely the situation in which Defendant acknowledged a duty to pay a percentage of all profits: "[A] plaintiff seeking disgorgement of profits is not always entitled to a percentage of all of the defendant's profits; rather, a plaintiff is so entitled, if at all, only where the defendant cannot specifically identify which of its profits flowed from the breach." Def.'s Resp. to Pl.'s Br. at 2 (citing *Leigh v. Engle,* 727 F.2d 113, 138

(7th Cir.1984)). Defendant cannot specifically identify which of its profits flowed from its wrongful withholding of Plaintiff's benefits.

Defendant has failed to specifically identify which of its profits flowed from the breach of Defendant's duty to Plaintiff. Plaintiff's money appears to have been placed in a general "pot" of equity, which could have been used for investment *or* for general operating expenses *or* for any other expense by Defendant. Defendant's contention regarding an "investment account" somehow segregated from general equity appears to be purely theoretical. Defendant has the burden of demonstrating that Plaintiff's approximation is not reasonable. The Court finds that Defendant has failed to meet this burden. Thus, as discussed below, the Court adopts Plaintiff's method of determining the profits derived by Defendant from the use of Plaintiff's unpaid benefits.

**B. Method of Determining Profits**

Calculating the amount of unjust enrichment is the function of four variables, of which the parties agree on the first three. First, the underlying principal amount due from LINA to Plaintiff's estate— $910,629.24, which is inclusive of simple interest on the base payments[2]. Second, the amount of time during which those amounts were unpaid—the parties agree that the principal should have been paid in equal monthly installments beginning in 2002. Third, the form of compounding— the parties agree that compounding of interest on the amount owed should take place on a monthly basis. Only the fourth variable is disputed—the amount of Defendant's unjust enrichment derived from use of the principal that was owed to Plaintiff.

**Return on Equity Theory ("ROE")**

Plaintiff argues that Defendant's profits from the use Plaintiff's unpaid benefits should be calculated using a "Return on Equity Theory." Under ROE theory, the correct measure of profit is Defendant's annual rate of growth in its net worth between 2002 and the present, that percentage rate varying annually between 11% and 39%, excluding certain growth in net worth, such as injection of capital by Defendant's parent company, CIGNA Corporation.

■ As discussed above, Plaintiff argues, and Defendant's expert admitted, that the withheld benefits were retained as funds that went straight to Defendant's "bottom line" equity. The profit from the withheld benefits could have been used by Defendant for any and all investments and/or corporate expenses (thus freeing up other money for investment). A useful case in analyzing how Defendant's profits should be determined is *Nickel v. Bank of America*, 290 F.3d 1134 (9th Cir.2002), a case where a bank improperly overcharged various trusts $24,000,000 over the course of fifteen years. Bank of America acquired the bank and later refunded the $24,000,000, along with $17,800,000 in simple interest. The district court agreed to this restitution, ruling that any account of profits derived from the improper overcharges would have been too "speculative" and too difficult to track given the relatively small amounts of various trusts. The Ninth Circuit reversed, finding that the district court's focus on the "speculative" nature of the remedy and traceability simply insulated the wrongdoer in this case, the bank, and violated a rule of restitution, namely "if you take my money and make

**2.** Plaintiff states that this total amount is the amount of payments made in multiple installments over three years, and that Plaintiff is still working to determine if this is the exact amount of principal. However, both parties seem to agree that this figure is at least a close approximation.

money with it, your profit belongs to me." *Id.* at 1138. The court also found that if the manner in which the bank had utilized the money was not traceable, there was a presumption that the bank was deriving profit from the funds. Thus, an appropriate remedy was a proportional share of the bank's profits for the period the funds were utilized. *Id.* at 1139.

### Retained Investment Management Theory ("RIM")

Defendant's theory of how its profits should be measured has already been discussed and rejected above based on evidence that Defendant did not, in fact, maintain a separate "investment account" in which Plaintiff's withheld benefits were placed. The Court therefore does not accept Defendant's assertions regarding separate "underwriting" and "investment" income. Defendant had argued that its "retained investment" profit was roughly 1% per year.

Further, Defendant's assertions that unpaid claims that have been approved for payment are placed in "investment accounts" used only for limited investment purposes is inapplicable to the case at hand: Plaintiff brought suit to recover wrongfully withheld benefits from Defendant precisely because the benefits had *not* been approved by Defendant. Defendant argues that unpaid benefits that sit in "investment accounts" then generate only "incremental investment income." Def.'s Br. at 2. Again: it is unclear why Plaintiff's unpaid benefits would have been set aside in an investment account given that Plaintiff's benefits claim was wrongfully denied. Moreover, as discussed above, the argument that Defendant's "investment account" is somehow cabined from Defendant's other sources of income and spending is inaccurate:

Q. And as you sit here today, can you rule out the possibility that a portion of the funds LINA owed Mr. Rochow were used to pay for LINA's ongoing operating expenses?

A. No.

Q. Okay. And I would like to talk then about some of the outflows from the investment account.

Is it fair to say that LINA will be paying operating expenses out of the investment account?

A. That's normally how the process in an insurance company works, yes.

Tr. at 123.

The Court rejects Defendant's "Retained Investment Management" theory of profits and accepts Plaintiff's "Return on Equity" theory as a baseline measure of profits gained by Defendant as unjust enrichment through the use of Plaintiff's wrongfully withheld benefits. The Court must now determine whether the various "offsets" proposed by Defendant should reduce the baseline measure of profits.

### C. Offsets

Defendant argues that, regardless of the method used by the Court to establish baseline profits, the profits gained by Defendant as unjust enrichment through the use of Plaintiff's wrongfully withheld benefits should be reduced by various "offsets." The Court will analyze each proposed offset in turn.

### Attorney's Fees

Defendant's original position statement and expert report indicated an offset of $232,000 for attorney's fees. At the evidentiary hearing held on November 4, 2011, however, Defendant indicated through counsel that attorney's fees were not an issue and "ha[d] never been an issue . . . ." Tr. at 89. The Court will therefore not consider attorney's fees as a potential offset.

### Discount for Retained Income

Defendant argues that when a claim is approved it triggers "the establishment of a specific case reserve in Defendant's administrative and financial system." This reserve is the "present value of the amount to pay to the claimant over the expected duration of the claim," but is "discounted," (meaning that there is actually less in the case reserve than the actual value of the claim, because money "now" is worth less than money at the time the claim will be paid out) and will "increase each year simply due to the passage of time as the discount is unwound," i.e., as money approaches its present value. Def.'s Br. at 4. Defendant states that the income generated by the investment portfolio is "therefore intended to offset that reserve increase over time ... only the investment income generated in excess of the amount needed to offset the unwinding of the discount is truly retained by LINA" *Id.* at 4–5. This is true in the sense that only this amount is "pure profit" for Defendant; however, Defendant is profiting from ALL the money in the investment account, not just the amount that it can retain—the fact that Defendant offsets the payment to discount for payment in the future makes sense financially, but Defendant is benefitting from that offset by not having to use other funds to make up the difference in Plaintiff's benefit account.

■ Regardless, however, much like Defendant's general claims regarding an "investment account," there is no evidence that a "specific case reserve" was established for Plaintiff's claim. This makes sense as Plaintiff's claim was not approved by Defendant. It is thus unclear why Defendant would have created a specific case reserve. Moreover, Defendant's expert admitted during the hearing of November 4, 2011 that no such reserve existed:

Q. So, the money just wasn't building up in a reserve account up to the point of payment. It was general equity as to LINA before that, wasn't it?

A. LINA maintains incurred but not reported reserves, which are reserves in the aggregate and not associated with a specific claimant. So. LINA did have reserves on its books for disability benefits.

Q. But there was no reserves specific for Rochow, was there?

A. Not specifically to Mr. Rochow, no. Tr. of Nov. 4, 2011 Hr'g at 93.

The Court therefore finds that Defendant may not discount its profits for retained income.

### Net Income

■ Defendant next argues that after the gross amount of incremental investment is determined, "specific adjustments" are made to determine the amount Defendant actually retained. Defendant uses the metric of "net income" to determine its investment return, saying that this is "the standard metric used to measure profitability within the insurance industry." Def.'s Br. at 9. While not identifying what "specific adjustments" being referred to, Defendant's argument seems to be that it should be permitted to deduct the costs of running its investment portfolio from profits gained by the use of Plaintiff's wrongfully withheld benefits. This seems to be against the spirit of restitution, as Defendant is essentially reimbursing itself for the administrative costs of using Plaintiff's money to make a profit. As noted in *Nickel, supra,* "if you take my money and make money with it, your profit belongs to me." 290 F.3d at 1138. The Court finds that Plaintiff should not be required to compensate Defendant for the costs of administering Plaintiff's wrongfully withheld benefits.

The Court therefore finds that Defendant may not offset its profits to reflect a "net income" measurement.

### Direct Interest Crediting

Defendant applies a 50% slash in the "rate of investment return" because it states that said amount is "returned to policyholders via direct interest crediting to the policyholders' benefit or indirectly as policy reserves increase due to the passage of time." While it is unclear how this amount would apply in comparison with overall profits, Defendant has again failed to demonstrate that this investment return actually applies to the benefit payments withheld from Plaintiff. The following exchange took place between Defendant's counsel and Defendant's expert Timothy Holzli:

Q. Would you stop there and please explain to the Court who this crediting involves or what it involves.

A. There are three specific circumstances where LINA credits investment income. The first of those is for group universal life contracts, which is a combination of a life insurance policy and an investment policy. Under those policies, the beneficiaries have a side account which is credited with a stated interest as per their policy documents.

Q. Other than the first adjustment, what did you do next?

A. The second adjustment refers to certain experience rated contracts. LINA has certain contracts with employer groups that pass the claims experience of that group back to the policyholder. So, to the extent that that policy—that employer group has favorable claims experience, LINA establishes a liability payable back to that employer group. On that liability, LINA again credits interest to that employer group based on a stated contractual rate.

Tr. of Nov. 4, 2011 Hr'g at 35–36 (the third "credit" is the "discount for retained income").

A. [F]ifty percent represents the investment income that is, in fact, credited back to contract holders and policyholders.

Q. By the way, that 50 percent figure, is that a number that you just picked out of the air?

A. It is not. It's based on an internal analysis that we monitor. And over the years in question, it ranged between 45 and 55 percent.

Tr. of Nov. 4, 2011 Hr'g at 56.

■ While the Court credits Defendant's expert's statements that these credits do exist, Defendant has provided no evidence that the profits derived from the improper withholding of Plaintiff's benefits were or were not used for the purpose of refunding these credits. Nor is Plaintiff responsible for satisfying payments due because of Defendant's contractual agreements with third parties.

As such, the Court therefore finds that Defendant may not offset its profits by "direct interest crediting."

### Deduction of Taxes

■ Defendant argues that the "statutory rate" on its income is 35%. Defendant argues, based on *In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 567 (2d Cir. 1994), that they may deduct income taxes from restitution, but fails to note that the Second Circuit Court of Appeals only permitted said deduction when the wrongful act leading to the unjust enrichment was not "willful and deliberate." There is a long line of cases running against Defendant that hold that taxes cannot be offset from restitution payments where a Defendant deliberately engaged in a wrongful act. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 778 (9th Cir.2008) (investor in Ponzi

scheme could not offset unjust enrichment by amount of taxes); *SEC v. Razmilovic*, 2011 WL 4629022, at \*31 (E.D.N.Y.2011) (no offset for income taxes in insider trading case); *SEC v. Svoboda*, 409 F.Supp.2d 331, 345 (S.D.N.Y.2006) (no deduction for capital gains taxes in securities fraud).

■ The Court finds that Defendant's underlying actions in this case in refusing to grant Plaintiff benefits qualify as "deliberate and willful" wrongful acts. The Court has already ruled that Defendant acted in an arbitrary and capricious manner in its Order granting summary judgment to Plaintiff [12], and the Sixth Circuit has affirmed this ruling. *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860 (6th Cir.2007). In addition, in the Order [67] requiring disgorgement and an equitable accounting, this Court found that Defendant, in denying Plaintiff disability benefits, created "non-existent [insurance] policy requirements," concocted a "[k]nowingly false rationale for [the] second denial" of benefits, and closed the administrative record without medical input or evidence. This Court also found that Defendant had acted in bad faith. The Court finds that Defendants therefore acted in a "deliberate and willful" manner in carrying out the underlying wrongful act, the denial of benefits. Therefore, Defendant will not be permitted to deduct taxes from the disgorgement of their unjust enrichment.

### Realized versus Unrealized Gains

Plaintiff argues that "unrealized gains" should be taken into account in determining Defendant's profit. Essentially, unrealized gains are gains in investments that Defendant has not yet "cashed in" or sold, but that have increased in value. Defendant argues that said gains are "paper gains" on investment that could decrease in value later, and thus it would be unfair to provide Plaintiff with a share of profits on investments that Defendant has not yet realized.

The circuits are divided on this question, and there is little clear caselaw. In *Ivan Allen Co. v. United States*, 493 F.2d 426 (5th Cir.1974), the court, in valuing securities for purposes of determining whether a corporation had unreasonably accumulated profits, set the value of the securities not at their original cost but at their fair market-value minus cost to realize said value. The court recognized that it was necessary, in considering profits, to look at the present fair-market value of an investment, particularly given the fact that the investments were easy to translate into liquid cash. The same rule applies in estate tax cases, where tax is assessed at the time of decedent's death, and investment value is based on fair-market value at time of death. *See Gump v. Comm'r of Internal Revenue*, 124 F.2d 540, 543 (9th Cir. 1941). Thus, both cases seem to support Plaintiff's position that unrealized gains in value should be taken into account in determining profit, as they suggest that this Court should look at the "present value" of Defendant's assets, regardless of whether the gains are realized or unrealized.

On the other hand, in *C.I.R. v. Godley's Estate*, 213 F.2d 529, 532 (3d Cir.1954), the court, in attempting to define "dividends" as "a corporate distribution to its shareholders out of its earnings or profits," defined "profits," and found that "unrealized gains should not increase earnings or profits." This supports Defendant's position.

■ The Court finds that this situation is more similar to levying an estate tax or other tax where a snapshot of fair-market value is necessary. Defendant has not and apparently cannot demonstrate that Plaintiff's withheld benefits were segregated into a fund from which it derived only realized gains. As the burden is on the

Defendant to establish which profits flowed from its unjust enrichment, the Court must assume that Plaintiff's funds were used in both realized and unrealized investments. Defendant should not be able to reap a windfall in unrealized investments from the use of Plaintiff's funds down the road merely because Defendant has not yet chosen to cash in on those investments; Defendant will likely realize eventual profit from the day-to-day increase in value of those investments purchased in whole or in part through the fruit of its unjust enrichment. While it is, of course, possible that said investments may decline in value over time, uncertainty in this issue should be resolved against the tortfeasor, in this case the Defendant.

The Court therefore finds that Defendant's profits must include unrealized gains.

### III. Conclusion

In summary, the Court finds that the Defendant has the burden of proof in demonstrating that its accounting is correct, and that uncertainty in accounting is resolved against Defendant. The Court finds that Defendant has failed to establish that the benefits wrongfully withheld from Plaintiff were segregated in a fund that limited profit to "investment income," and thus the Court adopts Plaintiff's method of determining the extent of Defendant's profits during the relevant period. The Court also rejects the various offsets proposed by Defendant.

### RELIEF

Plaintiff will, within two weeks from this order, submit a final amount to be disgorged by Defendant based upon the Court's rulings, above. Defendant may then submit a memorandum in response within seven days. This memorandum is limited only to any objections regarding the accuracy of Plaintiff's calculations based on this order, and is not an invitation to relitigate issues already decided by this Court.

**SO ORDERED.**